**Theo WILLIAMS, Plaintiff,**

v.

**UNITED TECHNOLOGIES CARRIER CORP., Defendant.**

**No. 1:02–CV–1036–TAB–DFH.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 25, 2004.

Denise K. LaRue, Haskin Lauter & La-rue, Indianapolis, IN, for Plaintiff/Counter Defendant.

John R. Maley, Barnes & Thornburg, Indianapolis, IN, for Defendant.

Harold R. Bickham, Mark W. Clark, Barnes & Thornburg, Indianapolis, IN, for Defendant/Counter Claimant.

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

BAKER, United States Magistrate Judge.

### I. Introduction.

After his termination due to a reduction-in-force ("RIF"), Theo Williams filed for bankruptcy protection and then sued his former employer, United Technologies Carrier Corp. ("Carrier"), alleging discrimination because of his race in violation of Title VII.[1] In response, Carrier filed counterclaims alleging breach of contract, unjust enrichment, and conversion. Carrier filed a motion for summary judgment, both with respect to Williams' discrimination claim and its own counterclaims. Williams filed a motion for summary judgment with respect to Carrier's counterclaims, arguing that the underlying damages at the heart of Carrier's counterclaims were discharged through bankruptcy. Therefore, Williams argues, Carrier's counterclaims are barred. For the reasons outlined below, Carrier's motion for summary judgment with respect to Williams' Title VII claim is GRANTED, Carrier's motion for summary judgment with respect to its counterclaims is DENIED, and Williams' motion for summary judgment is GRANTED.

### II. Summary Judgment Standard.

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This standard does not change when parties file cross-motions for summary judgment. *International Brotherhood of Electrical Workers, Local 176 v. Balmoral Racing Club, Inc.,* 293 F.3d 402, 404 (7th Cir.2002). "When considering the plaintiffs' motion for summary judgment, the court must consider the evidence in the light reasonably most favorable to the defendants, and vice versa." *Eaton v. Onan Corp.,* 117 F.Supp.2d 812, 818 (S.D.Ind.2000). *See also O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 983 (7th Cir.2001) (" 'With crossmotions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made.' ") (citation omitted).

■ Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *See Michael v. St. Joseph County,* 259 F.3d 842, 845 (7th Cir.2001). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Abrams v. Walker,* 307 F.3d 650, 653 (7th Cir.2002), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Although the above-described summary judgment standard is well estab-

---

1. Williams also brought an Indiana state law claim of intentional infliction of emotional distress. However, Williams abandoned this claim at summary judgment. Accordingly, summary judgment is GRANTED in favor of Carrier with respect to Williams' claim for intentional infliction of emotional distress.

lished, the parties' briefs reveal that even this ingrained concept cannot be agreed upon. For example, Williams suggests: "in this circuit employment discrimination cases are analyzed with 'added rigor,'" and that the summary judgment standard is applied "with special scrutiny to employment discrimination cases . . . ." [Docket No. 66, p. 18]. In reply, Carrier argues that "the Seventh Circuit has emphasized that there is *not* a heightened summary judgment standard for employment-related cases." [Docket No. 74, p. 4]. Carrier is correct. Although the Seventh Circuit has employed language such as "added rigor" and "special scrutiny" when discussing the summary judgment standard in employment discrimination cases, more recently that court explained that such language does not change the summary judgment standard. For example, the Seventh Circuit stated:

> We take this opportunity to briefly address our past use of the phrase "added rigor" in employment discrimination cases. The use of this phrase has raised the question of whether we have been reviewing grants of summary judgment in employment discrimination cases under a heightened level of scrutiny. . . . Although it is understandable how one might infer from our regular use of this phrase that we meant to communicate a more stringent standard to be used in reviewing employment cases, the original use of this phrase indicates that it was merely included to stress the fact that employment discrimination cases typically involve questions of intent and credibility, issues not appropriate for this court to decide on a review of a grant of summary judgment. Thus, regardless of our inclusion of the phrase "added rigor" in prior cases, we review a

district court's decision to grant a motion for summary judgment on a claim involving issues of employment discrimination as we review any case brought before this court involving the review of a grant of summary judgment.

*Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 680–81 (7th Cir.2001) (footnote omitted). Accordingly, the Court will analyze the pending summary judgment motions as it would any such motions, regardless of the type of case.

## III. Background [2]

### A. Williams' Employment and Termination.

On December 22, 1998, Williams accepted Carrier's offer of employment as a Leadership Associate in its Leadership Program. [Pl.'s Dep., pp. 74–76; Pl.'s Dep., Ex. 5]. Carrier's Leadership Program involved a two-year agenda that included three eight-month rotations during which Leadership Associates learned various aspects of Carrier's operations. [Pendleton Dep., p. 23; Pendleton Aff., ¶ 4; Pl.'s Dep., p. 75]. Williams' second rotation took place at Carrier's world headquarters in Farmington, Connecticut where he worked in direct sales and e-commerce. [Pl.'s Dep., pp. 84–86]. During this rotation, Anthony Ranieri, Carrier's Vice President of Sales and Marketing, successfully recruited Williams for a permanent position as an e-Business Manager in Carrier's Residential Light & Commercial Sales ("RLCS") business unit in Indianapolis. [Pl.'s Dep., pp. 89–90]. Williams' transfer to RLCS became effective on August 16, 2000, and he reported to George LaRose, Carrier's Director of Car-

---

**2.** The facts are either undisputed or viewed in a light most favorable to the non-moving party. In addition, this background section is a brief overview of the facts and is not meant to be an exhaustive recitation of all material facts in this case.

rier Brand, at that time.[3] [Pl.'s Dep., pp. 96, 98; Pl.'s Dep., Ex. 6].

As an e-Business Manager, Williams' responsibilities included: (1) strategic alignment of the Carrier, Bryant, and Payne marketing e-Business strategy with Carrier's 'Big 8 vision'; (2) coordinating the technology and process requirements with the IT department in order to achieve successful channel integration; and (3) focusing on strategic alliances, channel communication, business process development, and web usage to the extent it pertained to e-business strategy. [Pl.'s Dep., pp. 104–11; Pl.'s Dep., Ex. 7]. Williams' primary assignment became channel integration, and he spent 80 to 85 percent of his time devoted to this project. [Pl.'s Dep., pp. 115, 117–18].

On April 9, 2001, Carrier appointed Peter Lotto Senior Manager of e-Business for RLCS. [Lotto Aff. dated July 22, 2003 ("1st Lotto Aff."), ¶ 4; Lotto Aff. dated March 1, 2004 ("2nd Lotto Aff."), ¶ 4; Pl.'s Aff. ¶ 1]. In this position, Lotto's direct reports were: Williams, e-Business Man-ager; Allen Day, e-Business Manager; Bruce Everly, Software Product Manager; Rex Hankins, Manager of Technical Communications and Publications; and Greg Issacs, Information Systems Manager. [1st Lotto Aff., ¶ 5]. In addition, Darryl Moody, Photographer, reported to Hankins and assisted Hankins with his duties as Manager of Technical Communications and Publications. [1st Lotto Aff., ¶ 5]. Williams was the only African–American within Lotto's direct reports. [Pl.'s Aff., ¶ 2].

As a result of a reduced market share and a disappointing financial performance, Carrier cut its workforce to reduce operating expenses. [1st Lotto Aff., ¶ 7]. In furtherance of the RIF, Carrier requested that the department heads, including Lotto, evaluate their employees and identify those who were performing the least critical functions in their respective departments. [1st Lotto Aff., ¶ 7]. Based on his evaluation, Lotto determined that Williams performed the least critical skills in the RLCS e-Business Group.[4] [1st Lotto Aff.,

---

3. The Court feels compelled to comment on the parties' material fact submissions. Local Rule 56.1 outlines the summary judgment procedures in this district. As that rule indicates, the focus is on material facts. *See* S.D. Ind. L.R. 56.1. Local Rule 56.1 defines material facts as "facts potentially determinative of the motion . . . ." *See also Pike v. Caldera,* 188 F.R.D. 519, 527 (S.D.Ind.1999) ("[A] 'material' fact is a 'potentially outcome determinative' fact."). While the Court understands the parties' desire to outline facts in a coherent fashion to enable the Court to understand the "story" of the case, irrelevant facts—and disputes over such irrelevant facts—should be avoided. *See Volovsek v. Wisconsin Dept. of Agriculture, Trade and Consumer Protection,* 344 F.3d 680, 686 (7th Cir.2003) ("the parties appear to have simply collected the sum total of all the unpleasant events in [the plaintiff's] work history since 1991, dumped them into the legal mixing bowl of this lawsuit, set the Title VII-blender to puree and poured the resulting blob on the court.").

For example, Williams has disputed that he met Ranieri during second rotation in the Leadership program, claiming it was instead his first. Also, Williams disputes that his transfer to RLCS resulted in a salary increase to $85,000.00 per year, "to the extent it implies that this was Williams' first pay increase." [Docket No. 66, p. 4]. The argument sections of the parties' briefs make it abundantly clear that neither of these facts are "material" in any sense of the word. If a party does not discuss (or even mention) a fact in the argument section of their brief, it is a strong indication that the fact is of marginal or no materiality.

4. Williams disputes this fact. [*See* Docket No. 66, p. 4]. However, there is no question that Lotto testified, via affidavit, that he determined that Williams performed the least critical function. [*See* 1st Lotto Aff., ¶ 8]. Instead, the Court understands Williams' dispute to be with Lotto's conclusion. In other words, Williams believes Lotto's conclusion is pre-

¶ 8]. On May 2, 2001, Carrier's Senior Human Resources Manager, Rejeana Pendleton, Lotto and LaRose informed Williams of his termination effective May 15, 2001. [1st Lotto Aff., ¶ 11; Pl.'s Dep., pp. 131–32]. Williams decided to leave immediately and not work through May 15, 2001. [Pl.'s Dep., pp. 132–33].

### B. Carrier's Counterclaims and Williams' Bankruptcy.

Upon beginning his employment with Carrier, Williams applied for and received a Corporate American Express Card on Carrier's account. [Pl.'s Dep., pp. 161–64; Pl.'s Dep., Ex. 10]. The account number on Williams' Corporate Card was 3785–110207–82009. [Pl.'s Dep., Ex. 11]. Williams understood that the Corporate Card was for business or commercial purposes only. [Pl.'s Dep., p. 163; Pl.'s Dep., Ex. 10]. In addition, Williams agreed that he was liable for payment to American Express of all amounts charged to the Corporate Card. [Pl.'s Dep., pp. 163–64, Pl.'s Ex. 10]. Williams did not turn in his Corporate Card after learning of his termination. [Pl.'s Dep., p. 164]. Instead, after the effective date of his termination, May, 15, 2001, Williams charged approximately $6,700 to the Corporate Card. [Pl.'s Dep., pp. 167–76; Pl.'s Dep., Ex. 11]. Each of these charges was personal and not business related. [Pl.'s Dep., pp. 178–79]. Carrier notified Williams of an outstanding balance of $10, 841.00 on the Corporate Card via a letter dated November 14, 2001. [Pl.'s Dep., pp. 164–65; Pl's Dep., Ex. 11]. Williams understood that his termination from Carrier did not relieve him of his liability for the Corporate Card charges. [Pl.'s Dep., p. 165]. Williams never paid the Corporate Card debt. [Pl.'s Dep., p. 178].

Williams filed for Chapter 7 bankruptcy protection on May 9, 2002 in the U.S. Bankruptcy Court for the Northern District of Illinois, Chicago Division. [Pl.'s Dep., p. 25; Pl.'s Aff., ¶ 38; Pl.'s Ex. I]. In his schedule of unsecured creditors, Williams identified American Express, account number 3785–110207–82009. Williams noted that amount of the claim equaled $11,143.10. [Pl.'s Ex. I]. Williams also identified Carrier as an unsecured creditor. In the schedule, Williams stated that Carrier's claim equaled $0.00, noting that Carrier was "Collecting for—American Express." [Pl.'s Ex. I]. The bankruptcy court served both Carrier and American Express with a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines relating to Williams' bankruptcy. This notice indicated that the deadline to file objections to the discharge of Williams or to determine the dischargeability of certain debts was August 26, 2002. [Pl.'s Ex. J]. Neither American Express nor Carrier filed any such objection. [Pl.'s Ex. L]. The bankruptcy court ordered Williams' debts discharged pursuant to 11 U.S.C. § 727 on September 3, 2002 and served both Carrier and American Express with the order of discharge. [Pl.'s Ex. K].

### IV. Discussion.

In its initial motion, Carrier contends that it is entitled to summary judgment on Williams' race discrimination claim for two separate reasons. First, Carrier believes that Williams cannot make out a prima facie case of discrimination because he fails to identify a similarly situated individual outside the protected class that was treated more favorably. Second, Carrier argues that, assuming Williams can meet his prima facie burden, Williams fails to establish that Carrier's nondiscriminatory rea-

text. The issue of pretext is discussed in detail below.

son for Williams' termination is pretext. In addition, in its reply brief, Carrier identifies an additional reason in support of summary judgment. According to Carrier, Williams did not have standing to file suit because his discrimination claim was the property of his bankruptcy estate and the bankruptcy trustee had not yet abandoned the asset at the time Williams filed his lawsuit.

With respect to its counterclaims, Carrier argues that the undisputed facts clearly establish that summary judgment should be granted in its favor on each counterclaim, i.e. breach of contract, conversion and unjust enrichment. Williams' sole argument to the contrary is that "the alleged damages underlying Defendant's counterclaims were discharged through bankruptcy proceedings" and, therefore, Carrier is prohibited from bringing those claims. [Docket No. 66, p. 31]. This same argument forms the basis of Williams' motion for summary judgment with respect to Carrier's counterclaims.

## A. Race Discrimination.

### 1. Standing.

The Court initially addresses the issue of Williams' standing to maintain this action. Carrier first raised this argument in its reply brief. Normally, "[a]n argument introduced for the first time in a reply brief is waived." *Fenster v. Tepfer & Spitz, Ltd.,* 301 F.3d 851, 859 (7th Cir. 2002). However, quoting *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), Carrier maintains that "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation." In contrast, Williams argues that "Carrier has confused the concepts of 'standing' with the doctrine of 'real party in interest.' The distinction is significant because unlike standing, chal-

lenges to a real party in interest status can be waived, and are not jurisdictional." [Docket No. 79, p. 1]. Williams is correct to point out the difference between constitutional standing and prudential standing. However, as explained below, Williams' Title VII claim reverted back to him when his bankruptcy case closed, and he is treated as having continuously owned the claim. Therefore, Williams satisfies both constitutional standing—he is the one who allegedly suffered injury at the hands of Carrier—and prudential standing—he is the real party in interest.

 As explained in *Guynn v. Potter,* 2002 WL 243626, at *4 (S.D.Ind.2002):

> The distinction between standing to sue and the real party in interest doctrine is often blurred. The two concepts are similar in that both "are used to designate a plaintiff who possesses a sufficient interest in the action to entitle him to be heard on the merits." *Weissman v. Weener,* 12 F.3d 84, 86 (7th Cir.1993). The doctrine of standing requires federal courts to make sure concrete legal issues are presented by a plaintiff with a particularized injury in fact traceable to the conduct of the defendant which is likely to be redressed by the relief sought. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). However, the designation of the real party in interest entails identifying the person who possesses the particular right sought to be enforced. *Firestone v. Galbreath,* 976 F.2d 279, 283 (6th Cir.1992).

*See also Tate v. Snap–On Tools Corp.,* 1997 WL 106275, at *4 (N.D.Ill.1997). Put another way, there is a difference between constitutional standing and prudential standing. *See Dunmore v. U.S.,* 358 F.3d 1107, 1112 (9th Cir.2004) ("Beyond this 'irreducible constitutional minimum of standing," we additionally require as a

prudential matter that [the plaintiff] assert his own legal interests as the real party in interest.") (citations omitted); *Gorski v. Troy*, 929 F.2d 1183, 1186–87 (7th Cir. 1991) (explaining constitutional and prudential limitations on standing). Because Williams was the individual who allegedly suffered discrimination at the hands of Carrier, the Court finds that Williams has constitutional standing. However, as noted by *Guynn*, "after the bankruptcy the issue becomes who is entitled to bring the claim—[the debtor] or the bankruptcy trustee. Thus, the issue is properly characterized as whether [the debtor] is the real party in interest." *Guynn*, 2002 WL 243626, at *5.

In brief, Carrier argues that Williams did not have standing at the time that he filed his action because his Title VII claim was the property of the bankruptcy estate. Thus, only the bankruptcy trustee had proper standing to sue on those claims. On this point, to the extent Carrier is referring to prudential standing or "real party in interest," Carrier's argument is correct. Williams' action against Carrier accrued on May 2, 2001 when Carrier informed Williams of his termination. Because Williams' discrimination claims arose prior to his bankruptcy filing on May 9, 2002, they became the property of the bankruptcy estate at the time of the bankruptcy filing. *Cable v. Ivy Tech State College*, 200 F.3d 467, 472–73 (7th Cir. 1999). Accordingly, at the time Williams filed the instant action, July 5, 2002, only the bankruptcy trustee, and not Williams, could properly bring and prosecute Williams' Title VII claims against Carrier. *Id.* at 472 ("In liquidation proceedings, *only* the trustee has standing to prosecute or defend a claim belonging to the estate."); *In re New Era, Inc.*, 135 F.3d 1206, 1209 (7th Cir.1998) (holding that Chapter 7 trustee has exclusive right to represent debtor in court). Therefore,

Williams did not have *prudential* standing at the time he filed suit because he was not the real party in interest at that time.

■■■ This conclusion, however, does not stop the inquiry. "A debtor may regain standing to pursue a cause of action if it is abandoned by the Trustee." *Anderson v. Acme Markets, Inc.*, 287 B.R. 624, 629 (E.D.Pa.2002). Pursuant to 11 U.S.C. § 554, abandonment of estate property occurs in several different ways. The trustee may affirmatively "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). Alternatively, a bankruptcy court may order the trustee to abandon estate property that is burdensome or of inconsequential value at the request of a party. 11 U.S.C. § 554(b). Finally, "[u]nless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor ...." 11 U.S.C. § 554(c). However, "a cause of action that was never scheduled cannot be abandoned to the debtor." *Anderson*, 287 B.R. at 629, *citing Harris v. St. Louis University*, 114 B.R. 647, 649 (E.D.Mo.1990). "[P]roperty of the estate that is not abandoned under [§ 554] and that is not administered in the case remains property of the estate." 11 U.S.C. § 554(d).

■■■ Here, it is undisputed that the bankruptcy trustee did not affirmatively abandon Williams' discrimination claim, nor did Williams request that the bankruptcy court order such abandonment. As such, 11 U.S.C. §§ 554(a) and (b) are inapplicable. However, Williams properly scheduled the lawsuit [Pl.'s Ex. I] and the bankruptcy court closed Williams' case on January 13, 2003. [Pl.'s Ex. L]. Accordingly, pursuant to 11 U.S.C.

§ 554(c), because the trustee had not otherwise administered the property of Williams' discrimination claims, it was abandoned on that date.

Carrier maintains that "the abandonment must occur *prior* to the filing of the suit" [Docket No. 74, p. 3] and, therefore, the trustee's abandonment of the property at any later date is insufficient to establish standing for Williams. *Citing Ball v. Nationscredit Financial Services Corporation,* 207 B.R. 869, 873 (N.D.Ill.1997); *Anderson,* 287 B.R. at 632; *Davis v. Avco Finance,* 158 B.R. 1000, 1003 (Bankr. N.D.Ind.1993). However, the Court does not believe the cases on which Carrier relies are applicable here. For example, in both *Anderson* and *Davis,* the debtors failed to properly schedule their respective claims. Therefore, upon the closing of the bankruptcy case, the claims remained the property of the bankruptcy estate and were not abandoned. *See Anderson,* 287 B.R. at 631 ("Because plaintiff failed to schedule or otherwise identify his Title VII claims in his amended Chapter 7 petition, . . . and because those claims are part of the bankruptcy estate, only the Trustee in Bankruptcy, as the sole representative of the estate, has standing to pursue the claims."); *Davis,* 158 B.R. at 1002 ("Since Debtors' cause of action was not scheduled, § 554(c) is not applicable and the cause of action was not deemed administered and abandoned.").

It is true that the *Ball* court held: "If [the debtor] lacked standing at the time this action was filed, the suit must be dismissed even if she later acquired an interest sufficient to support standing." *Ball,* 207 B.R. at 872, *citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 569–70 nn. 4–5, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *Lujan,* however, did not involve bankruptcy and, therefore does not consider that body of law. Moreover, *Ball* does not involve abandonment under 11 U.S.C. § 554. Thus, *Ball* is distinguishable.

The Court finds *Barletta v. Tedeschi,* 121 B.R. 669 (N.D.N.Y.1990), to be most applicable to this case. In *Barletta,* a Chapter 7 debtor filed a lawsuit regarding a claim that was the property of debtor's bankruptcy estate. Although the debtor properly scheduled the claim, the trustee did not abandon the claim until the bankruptcy court closed the bankruptcy case. Thus, the claim was technically abandoned at that time pursuant to 11 U.S.C. § 554(c). The court found: "The ordinary rule is that, when a trustee abandons property of the bankrupt, title reverts to the bankrupt, nunc pro tunc, so that he is treated as having owned it continuously." *Barletta,* 121 B.R. at 673, *quoting Wallace v. Lawrence Warehouse Co.,* 338 F.2d 392, 394 n. 1 (9th Cir.1964). After identifying the general rule, the court went on to explain:

> The question remains whether this reversion of title permits the plaintiff here to maintain his action when he did not have standing to sue at the time he filed his complaint, and the statute of limitations applicable to his claim has run. The court believes that it does. This rule of reversion is a legal fiction invented by the courts to aid them in achieving a just result. . . .
>
> Dismissing the plaintiff's claim for lack of standing here would create the inequitable result of extinguishing the plaintiff's claim through the inaction of the trustee, who did not intend to pursue the claim but did not abandon it, while at the same time preventing the plaintiff from taking action until it was too late. . . .
>
> Thus, in the court's opinion, upon the closing of plaintiff's bankruptcy case, title in his claim reverted to him as if no bankruptcy had ever been filed and the

plaintiff held title continuously. Consequently, the defendant cannot be heard to complain now that plaintiff was deprived of standing by his status as a debtor in bankruptcy.

*Barletta*, 121 B.R. at 674.

The Court agrees with *Barletta*'s sound and practical reasoning. The Seventh Circuit embraced this general rule in *Morlan v. Universal Guaranty Life Ins. Co.*, 298 F.3d 609 (7th Cir.2002), explaining:

[I]f the assignable part of Morlan's ERISA claim, having been transferred to the estate in bankruptcy by operation of law when Morlan filed for bankruptcy, was abandoned before the amended complaint was filed, he could sue to enforce it, because the effect of a trustee's abandoning a claim is to revest the ownership of it in the debtor. And actually, despite the attention we've been paying to getting the sequence right, the sequence doesn't matter; for when property of the bankrupt is abandoned, the title "reverts to the bankrupt, nunc pro tunc, so that he is treated as having owned it continuously."

*Morlan*, 298 F.3d at 617 (internal citations omitted).

 Because Williams properly scheduled his race discrimination claim, that claim was abandoned pursuant to 11 U.S.C. § 554(c) when the bankruptcy court closed the case. Accordingly, the race discrimination claim reverts to Williams as if he had never filed for bankruptcy protection. Williams, therefore, has standing to maintain the instant action.

## 2. Prima Facie Case.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discharging or otherwise discriminating against an employee in the terms, conditions or privileges of employment based on the employee's race. 42 U.S.C. § 2000e–2(a). " 'A Title VII plaintiff can satisfy her burden of proof by two avenues: (1) she may present direct evidence of discriminatory intent or, because of the difficulty in directly proving discrimination, (2) she may use the indirect, burden-shifting procedure set forth in McDonnell Douglas . . . .' " *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir.2003), *quoting Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir.1998). Since Williams presents no direct evidence of race discrimination, he proceeds under the *McDonnell Douglas* framework.

On summary judgment, Carrier does not dispute Williams' ability to satisfy the first three elements of the *McDonnell Douglas* test. Instead, Carrier argues that it is entitled to summary judgment because Williams "cannot satisfy the fourth element—that similarly situated employees outside of this protected class received more favorable treatment." [Docket No. 45, p. 15]. In contrast, Williams argues that Carrier "relies upon the wrong legal standard." [5] [Docket No. 66, p. 20]. According to Williams:

The Seventh Circuit recognizes that in reduction-in-force cases where unlawful discriminatory animus is raised, the forth prong of the *prima facie* case is modified to the extent that an inference of discrimination is established, without evidence that a similarly-situated employee was treated more favorably, if the employee demonstrates that employees outside the protected class absorbed the employee's duties.

[Docket No. 66, pp. 20–21]. The Court agrees with Williams on this point.

 "In the traditional RIF case, an employer permanently eliminates a posi-

---

**5.** In reply, Carrier does not counter Williams' argument in this regard.

tion from the workplace." *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir.2002). Under these circumstances, a plaintiff must show that other similarly-situated employees outside the protected class were treated more favorably. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). "However, in a mini-RIF, such as this case, employees remaining at the company absorb the duties of their former co-workers." *Krchnavy*, 294 F.3d at 876. In this situation, the "similarly-situated" requirement is eliminated. *Id.* The Seventh Circuit aptly explained the difference between the two frameworks as follows:

> Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show "similarly situated" employees who were treated more favorably. Instead, because the fired employee's duties are absorbed by other workers and the employee was " 're-placed,' not eliminated," we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class.

*Michas*, 209 F.3d at 693, *citing Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000). Although the mini-RIF analysis has typically been applied in single employee termination cases, the Seventh Circuit has further explained its broader use:

> Ultimately, calling an adverse employment action a "mini-RIF" merely emphasizes that *McDonnell Douglas* [*v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)], rather than the RIF test, should apply. In both the traditional *McDonnell Douglas* analysis and the mini-RIF analysis, the dis-

charged employee's duties are assumed by other employees (or in the mini-RIF scenario, the position is absorbed by other employees); in the RIF context, the employer no longer needs the discharged employee's duties performed. Thus, our decision whether an action is a RIF depends on whether HCC still needed Michas's job responsibilities to be performed. Even though HCC discharged multiple employees at the time it discharged Michas, HCC's own evidence demonstrates that HCC still needed someone to perform Michas's responsibilities and that Demaret intended, at the time of Michas's discharge, to perform them. Because Michas's responsibilities were absorbed and not eliminated, we will apply the McDonnell Douglas/mini–RIF standard.

*Michas*, 209 F.3d at 693–94.

■ The same is true in the case at hand. Carrier's statement of facts indicates that Williams' duties would be absorbed by other employees. According to Carrier: "Lotto noted Plaintiff's projects (*e.g.*, channel integration, content management, and the management of web development) were least critical to the RLCS' e-Business Group's overall charge and, perhaps more importantly, *could be assigned to other employees.*" [Docket No. 45, p. 8] (emphasis added). And in fact, at least some of Williams' duties were absorbed by non-African-American employees. For example, Williams' channel integration project duties were absorbed by Allan Day (Hispanic) and Greg Isaacs (Caucasian). [Pl.'s Ex. A, p. 3; Pl.'s Ex. B; Williams Aff., ¶ 3]. Therefore, viewed in a light most favorable to Williams, Williams' duties were not eliminated, but were absorbed by other non-African-American employees. Accordingly, Williams has demonstrated a prima facie case of race discrimination.

### 3. Pretext.

Because Williams establishes his prima facie case, the burden shifts to Carrier to provide a legitimate, non-discriminatory reason for its employment decision. *Stockett v. Muncie Indiana Transit System,* 221 F.3d 997, 1001 (7th Cir.2000). Carrier's burden at this point is one of production only, not one of persuasion. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To satisfy this burden, Carrier need only offer "admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Carrier does so, the burden shifts back to Williams to show that Carrier's stated reason is a pretext for discrimination.[6] *Contreras v. Suncast Corp.,* 237 F.3d 756, 760 (7th Cir.2001). Although the burden of producing evidence shifts between the employee and the employer, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), *quoting Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

Explaining Williams' termination, Carrier states that it "initiated a workforce reduction to reduce is [sic] operating expenses due to a reduced market share and disappointing financial performance." [Docket No. 45, p. 17]. In furtherance of the impending RIF, "Carrier asked Lotto and other department heads to evaluate their employees and identify which employees were performing the least critical functions in their respective departments, *i.e.,* which position(s) could be eliminated." [*Id.*]. Lotto evaluated the RLCS e-Business Group and determined that "Plaintiff's projects (*e.g.,* channel integration, content management, and the management of web development) were least critical to the Group's overall charge and, perhaps more importantly, could be reassigned to other employees. It was this assessment that lead [sic] to Plaintiff's inclusion in the workforce reduction." [*Id.*]. The Court finds that Carrier has met its burden of providing a non-discriminatory reason for Williams' termination. Therefore, the burden shifts back to Williams to show that Carrier's reason is pretextual.

 A plaintiff can defeat a motion for summary judgment on the issue of pretext by producing evidence that calls into question the employer's proffered reasons for the employment decision. *O'Connor v. DePaul University,* 123 F.3d 665, 670 (7th Cir.1997). To demonstrate pretext, Williams must demonstrate that Carrier's articulated reason for his discharge either: (1) had no basis in fact; (2) did not actually motivate his discharge; or (3) was insufficient to motivate his discharge. *See Worth v. Tyer,* 276 F.3d 249, 265 (7th Cir.2001); *Velasco v. Illinois Dept. of Human Serv.,* 246 F.3d 1010, 1017 (7th Cir. 2001). Pretext does not mean a mistake, but rather, "'a phony reason for some action.'" *Logan v. Kautex Textron N. Am.,* 259 F.3d 635, 640 (7th Cir.2001), *quoting Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). Essentially, Williams must show that Carrier's proffered reasons are "unworthy of credence."

---

**6.** Though the Court refers to Williams' burden to "show," "establish," or "demonstrate" pretext, the Court recognizes that to survive summary judgment on this issue Williams must only "show," "establish," or "demonstrate" that there remains a material issue of fact regarding pretext.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See also Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir.2000) (plaintiff must demonstrate that an employer's proffered explanation for an employment decision is a dishonest explanation, rather than merely an error). Williams does not dispute the underlying reason for the RIF, i.e. Carrier's reduced market share and disappointing financial performance. Instead, Williams attacks Lotto's decision to select Williams for reduction. To establish pretext, Williams argues that Lotto's decision is either factually baseless or not the actual motivation for Williams' termination. The Court addresses each of these contentions in turn.

Williams first argues that Lotto's determination that Day was the only employee with the expertise and experience to maintain the HVAC initiative at its current level has no basis in fact. This is because, Williams contends, "[t]he record shows that Williams had significantly more expertise and experience on the channel integration project than Day." [Docket No. 66, p. 23]. As evidence, Williams, in a single paragraph, points to Day's relatively brief tenure with Carrier at the time of Lotto's

May 2, 2001 decision to terminate Williams (Carrier hired Day on August 28, 2000), and Day's even shorter tenure as an e-business manager (Day began reporting to Lotto in this capacity in April 2001). According to Williams:

> Prior to Lotto's appointment in April 2001, Day did not have any project management responsibility for the e-business channel integration project. Day's responsibilities involved working on a consumer database including consumer household information and warranty information which was not part of the HVAC channel integration project. In approximately late 2000 and early 2001, both Day and Issacs provided information systems input concerning the RLCS database when it was time to integrate all of the Carrier division databases into the one combined HVAC partners database.

[Docket No. 66, p. 24].[7] Williams compares Day's lack of experience on the channel integration project with pages of detailed facts regarding Williams' specific duties, responsibilities, and accomplishments while assigned to the project.

The Court does not doubt Williams' role in the channel integration project and, viewing the facts in a light most favorable

---

7. Carrier objects to these factual contentions to the extent they are supported by Williams' affidavit, claiming that Williams lacks personal knowledge. Carrier's objection is well taken. In support of these factual contentions, Williams relies on two specific paragraphs, 12 and 28, from his affidavit. Paragraph 12 states: "In approximately late 2000 and early 2001, both Day and Issacs provided information systems input concerning the RLCS database when it was time to integrate all of the databases from the different divisions across Carrier into one combined database." Paragraph 28 states:

> Prior to Lotto's appointment, Day's responsibilities involved working on a consumer database, which included household information and warranty information. This

work was not part of the channel integration project. I frequently spoke to Day about his work because he was in the office next door to mine. Occasionally, I would speak to Day about the consumer database if it impacted the Brand teams I represented.

Carrier argues that "Plaintiff has no direct or personal knowledge of all of Day's job functions and any comments he "heard" about what role Day served amount to pure hearsay." [Docket No. 74, p. 9 n. 3]. The Court agrees. However, as explained in the body of this decision, even considering these contentions, Williams has not shown an issue of material fact that would preclude summary judgment in favor of Carrier.

to Williams, assumes he had significant expertise and experience regarding that project. However, Williams' rendition of the facts, i.e. Day's lack of experience in channel integration compared with Williams' significant experience, does not provide insight on what Lotto believed regarding Day's and Williams' respective qualifications. *See Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 602 (7th Cir. 2001) ("An *employee's* perception of his own performance, however, cannot tell a reasonable factfinder something about what the *employer* believed about the employee's abilities."). Williams' evidence is nothing more than *Williams'* perception of Day's performance and experience compared with *Williams'* perception of his own performance and experience. Such evidence does not, based on the record, create a question of material fact.

Seventh Circuit precedent makes it clear that "a court's 'role is to prevent unlawful hiring [and firing] practices, not to act as a 'super personnel department' that second-guesses employers' business judgments.'" *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1181 (7th Cir.2002). In *Millbrook,* the Seventh Circuit held:

> [W]here an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext "unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." In other words, "[i]n effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the

candidate selected over the plaintiff for the job in question.'"

> ... As we have stated, "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere." Rather, this "court must respect the employer's unfettered discretion to choose among qualified candidates." If we were to allow a jury to evaluate competing credentials to determine whether the employer's assertion that it selected the best candidate was pretextual, the jury would in most cases be replacing the employer's personnel department. Yet neither the judge nor the jury is "as well suited by training and experience to evaluate qualifications for high level promotion in other disciplines as are those persons who have trained and worked for years in that field of endeavor for which the applications under consideration are being evaluated."

*Millbrook,* 280 F.3d at 1180–81 (internal citations omitted).

Here, Williams has not produced evidence that his qualifications are so superior under the *Millbrook* standard. As noted by Carrier, Williams has no direct knowledge of all of Day's activities. According to the undisputed evidence, while an Information System Manager B, Day performed various functions, including:

> leading the business unit I/S strategic planning activities, managing all communications with the business unit staff regarding I/S initiatives in order to create an awareness of similar/parallel applications that might be of benefit to the business unit, and providing change management expertise for the business unit staff to facilitate implementation of change in support of any new programs and initiatives and taking responsibility

for communication of the same to the Information Systems organization. [2nd Lotto Aff., ¶ 10]. Moreover, according to Lotto, several months before Day began reporting to Lotto as an e-Business manager, Day performed the above described tasks with respect to the channel integration project. "Specifically, Day was instrumental in translating the channel integration business requirements into the necessary technical and programming specifications to roll out the projects and, more generally, handling the technical business side of channel integration." [2nd Lotto Aff., ¶ 10]. As revealed by *Millbrook*, neither the Court nor a jury is in the position to determine whether Day's experience in his previous position as Information System Manager B, as it related to channel integration, is equal to, greater than, or deficient when compared with Williams. *See Millbrook*, 280 F.3d at 1181. Therefore, comparison of Day's and Williams' credentials do not establish pretext.

This finding, however, does not conclude the pretext inquiry. According to Williams, "[e]ven if the Court determines that Williams' qualifications were not so superior to Day's, this would still constitute relevant evidence of pretext when combined with other evidence of pretext . . . ." [Docket No. 66, p. 27]. As a general proposition, Williams is correct. "The *Millbrook* standard is controlling in cases in which the plaintiff relies exclusively on evidence of the applicants' comparative

qualifications; however, it is not controlling where the plaintiff offers other evidence of retaliation [or discrimination] in addition to the differences in relative qualifications." *David v. Caterpillar, Inc.*, 324 F.3d 851, 862 (7th Cir.2003), *citing Millbrook*, 280 F.3d at 1183. However, as explained below, Williams' "other evidence" does not suggest pretext either.

Essentially, Williams maintains that Lotto set Williams up for reduction by changing his duties immediately before the RIF, and then using those change of duties against Williams to determine that his position was least critical. To illustrate this contention, Williams offers the following facts:

- Carrier appointed Lotto as Senior Manager of e-Business for RLCS on April 9, 2001. [Williams Aff., ¶ 1; 2nd Lotto Aff., ¶ 4; Pl.'s Ex. C].

- "According to Lotto, as an initial step in the reduction process, he was instructed to assess the RLCS e-Business Group and identify the functions each individual performed in order to determine which employees were performing the least critical functions which could be eliminated." [Docket No. 66, p. 28; 1st Lotto Aff., ¶ 7].

- "Consistent with these instructions," Lotto met with his staff during the week of April 16, 2001. [Williams Aff., ¶¶ 15–16].[8]

---

**8.** Carrier objects to this factual contention, stating:

> In his response, Plaintiff affirmatively asserts that Lotto visited Indianapolis on April 16, 2001, to evaluate employees for the purpose of initiating the workforce reduction process. [See Plaintiff's Statement of Material Facts, ¶ 121]. Though Plaintiff cites to record evidence, a careful review of those cites shows no support for Plaintiff's assertion. Furthermore, Plaintiff has no

personal knowledge of when Lotto initiated that process and, as shown by the record evidence, any assertion to the contrary is pure speculation.

[Docket No. 74, p. 7 n. 2]. Carrier's objection is well taken. Although Williams may have knowledge of who Lotto met with if he witnessed Lotto and other individuals enter a conference room, Williams does not have knowledge as to the reasons for, or content of, those meetings. Thus, Williams' suggestion

- "Prior to Lotto's visit he had sent an e-mail to Williams requesting a list of the projects he was currently working on. Williams provided this list to Lotto during their brief meeting. Williams['] list included the channel integration and other projects." [Docket No. 66, p. 29; Williams Dep., pp. 125–26; Williams Aff., ¶ 17].
- At the time of Lotto's appointment, Williams spent 80–85% of his time on the channel integration project. [Williams Dep., pp. 117–18].
- "Subsequent to his meeting with Lotto, Williams' day-to-day job responsibilities changed. Lotto instructed Williams to focus on just the content management of the Web site and back away from the channel integration component. Lotto also instructed him to continue working on strategic alliances." [Docket No. 66, p. 29; Williams Aff., ¶ 18; Williams Dep., pp. 127–29].
- "Lotto then assigned Williams' responsibilities for the HVAC partners web site channel integration project to Allen Day." [Docket No. 66, p. 29; Williams Aff., ¶ 20].[9]

However, Williams' evidentiary issues aside (*see* footnotes 7–9, *supra* ), the undisputed facts simply do not support Williams' speculative theory. For example, at the time Lotto instructed Williams to focus on content management, Lotto was unaware of the impending workforce reduction. [2nd Lotto Aff., ¶ 8]. In addition, when Lotto performed the RIF evaluation, he considered "all the tasks Plaintiff routinely worked on, including the channel integration activities that occupied most of Plaintiff's time before [Lotto] assigned the special projects." [2nd Lotto Aff., ¶ 9]. Simply put, Williams' theory does not create an issue of material fact with respect to pretext.

Finally, in his surreply, Williams argues that Carrier changed its reason for Williams' termination because of Lotto's statement that he "understood from Plaintiff's former supervisor, George LaRose, that Plaintiff had several areas in which he needed to improve his performance." [*See* Docket No. 79, p. 7; 2nd Lotto Aff., ¶ 5]. Therefore, Williams argues, pursuant to *Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 291 (7th Cir.1999), because of Carrier's changed reason for discharge, he is entitled to a trial. When an employer initially offers one explanation for an adverse employment decision and then later changes its story, *Stalter* teaches that issues of material fact remain that must be

that Lotto's April 16, 2001 visit was "consistent with" Carrier's instructions to reduce staff is purely speculation. This is especially true given the undisputed fact that Lotto did not have knowledge of the RIF at the time he changed Williams' duties. [See 2nd Lotto Aff., ¶ 8].

9. Once again, Carrier objects to this factual contention as being improper speculation. [*See* Docket No. 74, p. 9 n. 3]. The Court agrees. To support this conclusion, Williams states the following:

> I was present at a meeting with the employees at the call center. Day was allowed to facilitate the meeting which concerned training the employees on access and usage

of the web site. This was one of the duties I would have been responsible for in my role as e-Business manager for RLCS as this was part of rolling the project out. [*See* Williams Aff., ¶ 20]. The Seventh Circuit, "on numerous occasions, has made it clear that self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County,* 327 F.3d 588, 596 (7th Cir.2003). *See also Amadio v. Ford Motor Co.,* 238 F.3d 919, 927 (7th Cir.2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

resolved by a jury. *Stalter*, 195 F.3d at 291. However, this is not the case here. Despite Williams' suggestion that to the contrary, nothing in Carrier's reply brief is inconsistent with its previous explanation for Williams' selection for reduction. Nor does Carrier's reply suggest that Williams was terminated for performance reasons as Williams would have this Court believe. [*See* Docket No. 79, p. 7]. In short, Williams has not satisfied his burden to demonstrate that Carrier's stated reason for his termination is pretextual. Accordingly, Carrier's motion for summary judgment with respect to Williams' Title VII claim is GRANTED.

## B. Carrier's Counterclaims.

■■■ Carrier also seeks summary judgment on its counterclaims of breach of contract, conversion, and unjust enrichment. Each of Carrier's counterclaims arises out of Williams' unauthorized use of his Corporate Card and failure to pay his outstanding debt on that card. Williams also seeks summary judgment on Carrier's counterclaims arguing that "[t]he alleged damages underlying Defendant's counterclaims were discharged through bankruptcy proceedings on September 3, 2002. Defendant is therefore prohibited from asserting claims against Williams for those alleged damages." [Docket No. 63, pp. 1–2]. Because the Court agrees with Williams, it does not reach the merits of Carrier's counterclaims.

Williams' argument on this matter is persuasive. Discharge under 11 U.S.C. § 727 "discharges the debtor from all debts that arose before the date of the order for relief," except as provided in 11 U.S.C. § 523. *See* 11 U.S.C. § 727(b). While Williams acknowledges that § 523 precludes discharge for debts arising from certain fraudulent or willfully malicious actions, *see* 11 U.S.C. §§ 523(a)(2), 523(a)(4),

523(a)(6), Carrier has not argued that Williams' alleged debt falls within any of these exceptions. Moreover, even if the debt fell within one of these exceptions, because Carrier failed to file an objection within the specified time frame allowed by the bankruptcy court, the debt was discharged. *See* 11 U.S.C. 523(c); *In re Mendiola*, 99 B.R. 864, 866 (Bankr.N.D.Ill. 1989) ("What is special about these intentional tort claims is that they will be discharged just like any other debt, unless the creditor files a complaint to determine their dischargeability in the bankruptcy court (which has exclusive jurisdiction) within a strict time limit of 60 days after the first meeting of creditors.").

Carrier's sole argument in response to Williams' motion for summary judgment is that Williams failed to properly schedule Carrier as required by 11 U.S.C. § 521(1). According to Carrier:

Although Plaintiff did list Carrier Corporation as a creditor on Schedule F of his bankruptcy schedules, Plaintiff listed the amount of Carrier's claim as "0.00". Furthermore, Plaintiff conceded that he listed Carrier Corporation as "collecting for" American Express on Schedule F of his bankruptcy schedules.

Thus, it is undisputed that Plaintiff's indebtedness to Carrier was not properly scheduled by Plaintiff as required by 11 U.S.C. § 521(1). As a result, Carrier had no notice or actual knowledge of Plaintiff's bankruptcy case in time to make a request for determination of dischargeability of its claims against Plaintiff, or to file proof of claim. As a result, Plaintiff's debt to Carrier was excepted from his bankruptcy discharge under 11 U.S.C. § 523(a)(3).

[Docket No. 74, p. 16; Docket No. 75, p. 3].

This argument, at best, is a stretch. Williams listed both Carrier and American Express in his list of creditors. With re-

spect to American Express, Williams identified both the account number of the Corporate Card and the amount of the debt. With respect to Carrier, Williams stated that Carrier was collecting on behalf of American Express. Both American Express and Carrier were served with the notice of bankruptcy and notice of discharge. Carrier's assertion that it did not have notice or actual knowledge of Williams' bankruptcy case is simply unsupported by the evidence. Therefore, the lack of "notice or actual knowledge" exception to discharge outlined in 11 U.S.C. 523(a)(3) is not applicable under the facts of this case. Accordingly, the Court finds that Williams' debt with respect to the Corporate Card was discharged through bankruptcy. Therefore, with respect to Carrier's counterclaims, Williams' motion for summary judgment is GRANTED and Carrier's motion for summary judgment is DENIED.

## V. Conclusion.

Carrier's motion for summary judgment with respect to Williams' Title VII claim and Indiana state law claim for intentional infliction of emotional distress is GRANTED. With respect to Carrier's counterclaims, Williams' motion for summary judgment is GRANTED and Carrier's motion for summary judgment is DENIED. Final judgment shall be entered accordingly. Each party shall bear its own costs.