In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2221

Christopher J. Michas,

Plaintiff-Appellant,

v.

Health Cost Controls of Illinois, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 5104--Rebecca R. Pallmeyer, Judge.

Argued January 21, 2000--Decided April 6, 2000

Before Bauer, Ripple and Kanne, Circuit Judges.

Kanne, Circuit Judge. Christopher Michas brought suit against his former employer, Health Cost Controls, Inc. ("HCC"),/1 claiming that HCC wrongfully terminated him on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. sec. 621 et seq. Following discovery, HCC moved for summary judgment, and the district court granted HCC's motion. The district court found that Michas had not made a prima facie case because he failed to present sufficient evidence that his duties had been transferred to similarly situated employees who were not within the protected class and he failed to present evidence that HCC's reasons for his dismissal were pretextual. Michas appeals both decisions. We affirm.

I.  History

The district court found that Michas failed to comply with Local Rule 12(N),/2 so the court made undisputed findings of fact based on HCC's Local Rule 12(M) submissions. As a threshold matter, Michas argues that the district court erred because his statement of additional facts, filed in accordance with Local Rule 12(N)(3)(b) and simultaneously with his Rule 12(N)(3)(a) response, raised genuine issues of material fact that must be construed in his favor. HCC properly submitted its Rule 12(M) uncontested findings of

facts, and Michas's Rule 12(N)(3)(a) response to these facts never accompanied its denials of HCC's facts with citations to the record. "An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission." McGuire v. United Parcel Serv., 152 F.3d 673, 675 (7th Cir. 1998).

That Michas's simultaneous submission of additional findings of fact might pose a challenge to these admissions is not relevant to whether Michas properly filed his Rule 12(N)(3)(a) answer. The purpose of the Rule 12(N)(3)(b) statement is to provide additional uncontested facts not raised in the movant's Rule 12(M) statement; its purpose is not to provide a forum to contest facts that should have been contested in the non-movant's Rule 12(N)(3)(a) statement. Therefore, we conclude that the district court did not err in accepting HCC's statements as uncontested, and we will do likewise. However, to the extent that facts included in Michas's Rule 12(N)(3)(b) statement prove relevant, we will consider these as well as the admitted facts from the 12(M) statement in a light most favorable to Michas.

A.  Background

In 1963, Michas graduated from law school and began to work for Montgomery Ward & Co. in its corporate legal division located in Chicago. During the course of his employment at Montgomery Ward, Michas became acquainted with William Hanley, an attorney employed by Montgomery Ward in its labor relations department. In the mid-1960s, Hanley left Montgomery Ward and entered private practice.

In 1991, Montgomery Ward laid off most of its corporate legal division, preferring instead to out-source its legal work to the law firm of Altheimer & Gray. Michas was one of the attorneys laid off by Montgomery Ward. In March 1992, Michas met Hanley again and told him that he was unemployed. Hanley worked as a partner in a private law firm, and in addition, he had recently formed a new corporation, HCC. Hanley referred Michas to a number of private law firms, but these leads did not pay off. Ultimately, Hanley introduced Michas to HCC's co-founder and CEO, John Demaret.

B.  HCC

HCC asserts subrogation rights on behalf of HMOs, health insurance carriers and other health care plans against parties who may be liable in tort to insured members of these organizations or

their members. In addition, HCC asserts the contractual rights of health care organizations against their members and insureds. HCC was formed in 1988 by Hanley and Demaret, and during all relevant periods, Hanley and Demaret were the principal stockholders of the corporation. Demaret also served as HCC's president and CEO and ran the day-to-day operations of the company, while Hanley was HCC's chairman of the board and worked primarily on marketing the company.

HCC's employees worked as teams. Each team was composed of attorneys, who acted as supervisors, and claims adjusters. The teams attempted to settle claims subrogated to HCC. If these claims proceeded to litigation, the teams referred the claims to Demaret who, in turn, generally referred these claims to outside counsel for the litigation.

C. Michas's Employment with HCC

Soon after meeting Demaret, Michas began to work for HCC as a contract attorney. The relationship initially proved favorable, and in July 1992, Demaret and Hanley hired Michas to work full-time as head of HCC's legal department. The "legal department" consisted of Michas, a paralegal and a secretary. Michas reported to Demaret on all matters. Michas's primary job responsibilities included research, advising staff on legal issues and acting as liaison to the outside counsel who handled HCC's core business of litigation. As a part of this liaison activity, Michas was responsible for monitoring the fees charged by outside counsel, and Michas also helped Demaret manage some of the claims that outside counsel litigated for HCC.

Soon after Michas began to work for HCC, Demaret became dissatisfied with Michas's work performance. The parties disagree over the extent that Michas was informed of this growing dissatisfaction. HCC has no formal evaluation procedure, and as a result, much of the evidence produced about Michas's performance comes from the parties' deposition testimony. Michas was given an incremental raise each year and a small bonus in December 1993. Michas claims that Hanley and Demaret told him when he was given these raises that everything was fine with his performance. Nonetheless, Demaret and Hanley refused his request for a more substantial raise in 1994. Demaret, Hanley and one of the team leaders, Stephen Prazuch, all testified to Demaret's dissatisfaction with Michas's performance, and on a number of occasions, Demaret criticized Michas's performance in short memos written to Michas.

In late 1994, Demaret began to consider ways to improve the performance of his legal department. He and Michas discussed expanding the department, but Demaret ultimately decided against this strategy. Hanley also asked Michas if he would prefer to act as a team supervisor. Michas declined this offer, so HCC hired another attorney to fill this role. In early 1995, HCC hired a new chief financial officer, Michael Neil, a move that raised the fixed costs of the firm. About the same time, a number of HCC's larger clients indicated their desire to cut ties with the company. Faced with rising fixed costs and a potentially precipitous decline in revenue, Demaret began to consider laying off the legal department.

In April 1995, Neil produced a summary detailing the costs associated with maintaining the legal department. The summary showed that HCC would save $114,697 by dissolving the legal department, and of this sum, $81,947 would be saved by Michas's discharge. Armed with these numbers and the threat of lower revenues, Demaret convinced an initially hesitant Hanley that the legal department must be laid off. On April 24, 1995, Hanley and Demaret informed Michas that they were firing him. Demaret and Hanley told Michas that they were trying to reduce operating costs in the face of a potential loss of important clients. On that date, HCC also fired the rest of the legal department--the secretary and the paralegal--along with Michas. The secretary was a member of the class protected by the ADEA, which is to say that she was over forty years old, but the paralegal was not. Michas was fifty-five years old at the time of his discharge.

D.   HCC's Later Activities

After the legal department was disbanded, Demaret assumed most of Michas's responsibilities and delegated the remainder of Michas's duties to the team supervisors. Demaret is older than Michas and a member of the protected class, but some of the team supervisors who assumed Michas's responsibilities were not members of the protected class.

About the same time that HCC laid off its legal department, HCC was approached by a venture capital firm, JMI, which was interested in purchasing the company. As a part of the deal, JMI requested that HCC hire consultant John Blaney, who has since become president of the company. Blaney was hired on April 25, 1995, the day after Michas's discharge, at a salary of $180,000 per year. Negotiations over the purchase progressed through mid-1995, and in July, Demaret

decided that he again needed an in-house attorney. Demaret wanted the new attorney to manage outstanding cases, so that he could focus on preparing HCC to be sold. Thus, the new attorney would assume a role similar in many respects to the role Michas served before his discharge.

HCC initially offered the job to Prazuch, a team leader. Prazuch was not a member of the protected class. Prazuch initially accepted the offer, but after further consideration, he decided to refuse. Instead, in October 1995, HCC hired Henry Romano as corporate counsel. Romano assumed most of Michas's previous functions, as well as many functions that had never been delegated to Michas. Romano was a member of the protected class. In late 1995, JMI completed the purchase of a majority of HCC's outstanding stock. For this reason, Demaret no longer maintains an active role in the company. Most of the case management duties once performed by Demaret are now handled by Romano, who has assumed the position of corporate counsel.

Soon after his discharge, Michas filed a complaint against HCC in district court, claiming that HCC had violated the ADEA by discharging him. The parties proceeded through discovery, and at its close, HCC moved for summary judgment. HCC claimed that Michas could not make a prima facie case for age discrimination because he was not replaced by someone outside the protected class and because he could not prove he was performing to HCC's legitimate expectations. In addition, HCC claimed that it had two legitimate reasons to terminate Michas: his subpar performance and its need to cut costs. Because Michas failed to comply with Local Rule 12(N)(3)(a), the district court accepted HCC's uncontested statement of facts as true. On these facts, the court found that Michas could not make out a prima facie case, nor could he show that HCC's reasons for discharging him were pretextual. Therefore, the district court granted HCC's motion for summary judgment.

II.  Analysis

On appeal, Michas argues that the district court erred in finding that the evidence, even when weighed in his favor, failed to raise material questions of fact. First, Michas argues that he included sufficient evidence that his position remained open and he was performing adequately to make a prima facie case against HCC. Second, he argues that he presented evidence sufficient to demonstrate that HCC's articulated legitimate non-discriminatory reasons for

terminating him were pretextual.

We review de novo the district court's grant of summary judgment, drawing conclusions of law and fact from the record before us. See Feldman v. American Memorial Life Ins. Co., 196 F.3d 783, 789 (7th Cir. 1999). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether any genuine issue of material fact exists, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) (citation omitted).

We apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility. See Bellaver v. Quanex Corp., 200 F.3d 485, 491 (7th Cir. 2000); Geier v. Medtronic, Inc., 99 F.3d 238, 240 (7th Cir. 1996). However, neither "the mere existence of some alleged factual dispute between the parties," Anderson, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.

A. Michas's Prima Facie Case

The ADEA makes it unlawful "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. sec. 623(a)(1). We will find an ADEA violation when a plaintiff presents evidence that demonstrates that age was a "determining factor" in a discharge decision. See Smith v. Great Am. Restaurants, Inc., 969 F.2d 430, 434 (7th Cir. 1992) (citations omitted). A plaintiff pursuing an ADEA claim has two ways to make such a prima facie case. Either he can present direct evidence that age was a determining factor in his discharge, see Cowan v. Glenbrook Sec. Servs., Inc., 123 F.3d 438, 443 (7th Cir. 1997), or he can present indirect evidence to demonstrate that the employment decision "was motivated by the employer's discriminatory animus." Bellaver, 200 F.3d at 492.

Michas presents no direct evidence that his age was a determining factor in his discharge and attempts to make a prima facie case by circumstantial evidence. Because he presents no direct evidence of discriminatory animus, Michas must rely on the inferences that we may draw from indirect evidence. The traditional test for determining workplace discrimination by indirect evidence requires the plaintiff to make a prima facie case of discrimination, then shifts the burden of producing evidence of a legitimate non-discriminatory motive to the defendant. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also Baron v. City of Highland Park, 195 F.3d 333, 338 (7th Cir. 1999) (applying McDonnell Douglas burden-shifting analysis to ADEA claims). If the defendant provides a legitimate motive for termination, the burden shifts again to the plaintiff to provide evidence that this motive was pretextual. See id.

Under the traditional McDonnell Douglas test, the plaintiff is required to present evidence on four prongs to make a prima facie case. He must show that (1) he is a member of a protected class, (2) he reasonably performed to his employer's expectations, (3) he was subject to an adverse employment action and (4) the position remained open. See McDonnell Douglas, 411 U.S. at 802. However, recognizing the variety of adverse employment actions covered within the broad reach of the discrimination statutes, we have adapted the requirements for making a prima facie case in special cases to reflect the reality of the workplace. See Bellaver, 200 F.3d at 494. Here, the parties agree that Michas's termination constitutes a special case, but they differ in their description of the type of case presented and in the requirements that must be met to make a prima facie case.

HCC argues that Michas's termination was a part of a reduction in force ("RIF"). A RIF occurs when an employer permanently eliminates certain positions from its workforce. See id. Because the employer has removed a position entirely, the position will never be refilled. In such a case, it makes little sense to require a plaintiff to meet the fourth prong of the McDonnell Douglas test, in which the plaintiff must demonstrate that the position remained open or was filled by someone who is not a member of the protected class. Instead, we require a plaintiff to demonstrate that other similarly situated employees who were not members of the protected class were treated more favorably. See id.

To prove discrimination in a RIF, Michas must prove that there were "similarly situated"

younger employees who were treated more favorably than he was. To make this proof, Michas first must have shown that his position was "similarly situated" with younger employees who were not terminated. The district court found that Michas presented no evidence that his job was fungible with the younger team leaders who were not terminated. For this reason, the court found no genuine issue of material fact about whether "similarly situated" individuals were treated better than Michas.

Michas seeks to recharacterize his termination not as a true RIF, but as a case of what this circuit has dubbed a "mini-RIF." See Bellaver, 200 F.3d at 495. In a mini-RIF, a single employee is discharged and his position is not filled. However, the employee's responsibilities are assumed by other members of the corporate workforce. See Gadsby v. Norwalk Furniture Corp., 71 F.3d 1324, 1331 (7th Cir. 1995). Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show "similarly situated" employees who were treated more favorably. Instead, because the fired employee's duties are absorbed by other workers and the employee was "'replaced,' not eliminated," we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class. See Bellaver, 200 F.3d at 495.

Ultimately, calling an adverse employment action a "mini-RIF" merely emphasizes that McDonnell Douglas, rather than the RIF test, should apply. In both the traditional McDonnell Douglas analysis and the mini-RIF analysis, the discharged employee's duties are assumed by other employees (or in the mini-RIF scenario, the position is absorbed by other employees); in the RIF context, the employer no longer needs the discharged employee's duties performed. Thus, our decision whether an action is a RIF depends on whether HCC still needed Michas's job responsibilities to be performed. Even though HCC discharged multiple employees at the time it discharged Michas, HCC's own evidence demonstrates that HCC still needed someone to perform Michas's responsibilities and that Demaret intended, at the time of Michas's discharge, to perform them. Because Michas's responsibilities were absorbed and not eliminated, we will apply the McDonnell Douglas/mini-RIF standard.

Under McDonnell Douglas, Michas needed to present evidence that his position was absorbed,

not eliminated to meet this aspect of his prima facie case. In its findings of fact, the district court accepted HCC's statement that Michas's responsibilities were assumed by Demaret. This evidence is sufficient to create a genuine question of fact as to whether Michas met the fourth prong of the McDonnell Douglas test. Therefore, had the district court granted summary judgment on this basis alone, we would find that the court erred in its grant of summary judgment.

The district court also found that Michas failed to make a prima facie case because he failed to present sufficient evidence that he was performing to HCC's expectations. HCC blames Michas's discharge, in part, on Michas's subpar performance. Because of the overlap between this element of Michas's prima facie case and his claim of pretext, we will analyze the dispute over Michas's performance within the context of HCC's grounds for discharge. However, we will discuss the district court's analysis of this only if we determine that HCC's other claim, that it discharged its legal department in an effort to reduce costs, was pretextual. The district court found that Michas presented no evidence to refute HCC's claimed legitimate non-discriminatory motive. Michas contends that he produced evidence sufficient to create a genuine issue of fact that these claims were pretextual.

B.  Pretext

When a plaintiff presents facts that constitute a prima facie case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant employer to present a legitimate non-discriminatory motive for the adverse employment action. See Testerman v. EDS Technical Products Corp., 98 F.3d 297, 302 (7th Cir. 1996). If the defendant proffers such reasons, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 397, 398 (7th Cir. 1997).

HCC argues that its decision to discharge him was economically motivated. Michas contends that this explanation is incredible and presents facts that he believes raise a question of fact about HCC's credibility. He contends that because HCC considered expanding the legal department only

six months before laying it off and because HCC hired three new employees in the period directly preceding his discharge, HCC could not have been in the financial pickle that it claimed. Michas also notes that on the day after he left, HCC hired a consultant at a salary of $180,000 per year and that HCC's net income remained constant despite all these additional expenses.

All these facts tend to suggest that HCC was not in dire financial straits when it decided to eliminate its legal department. However, HCC does not contend that it was financially desperate. The company merely claims that it faced a large loss in revenue and rising fixed costs. Because of these financial factors and the desire to put its financial house right pending its acquisition, HCC decided that its financial interests would best be served by reducing expenses in departments considered extraneous. HCC presents evidence to support this claim, including deposition testimony of the threat of lost business (although only one of the three clients considering leaving actually left), stagnant net income for 1995 despite a 25 percent increase in gross revenues and testimony about HCC's need to cut costs in the face of a potential acquisition.

To show pretext, Michas must present evidence from which we may infer that HCC did not, at the time of his discharge, honestly believe the reason they gave for firing him. See McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992). Michas provides no evidence that HCC did not believe that it needed to cut costs where it could. Instead, Michas again wishes us to infer from the circumstantial evidence that a seemingly legitimate business decision was based on discriminatory motive. In the absence of any direct evidence, however, we will not second-guess the business decisions made by an employer. See Wolf v. Buss (America) Inc., 77 F.3d 914, 920 (7th Cir. 1996). Michas claims that this business decision was motivated not by a decision to cut costs, but by discriminatory animus. However, he presents no evidence of such animus, nor any evidence that would tend to disprove that HCC was motivated by a desire to cut costs. We find that Michas has failed to present evidence sufficient to create a genuine question of material fact whether HCC's legitimate business motive for dissolving his department was pretextual.

HCC also argues that its decision to discharge Michas in part was based on his subpar performance. This argument may be considered an alternative motive for Michas's termination, or it may merely have been provided to explain why the legal department was chosen to be dissolved

as a cost cutting measure. Nevertheless, we need not address the question whether Michas's performance met HCC's expectations or was a basis for his discharge. Michas has not produced evidence sufficient to create a question of fact as to whether HCC's decision to terminate its legal department was pretextual. Therefore, we find no error in the district court's grant of summary judgment on this ground.

## III.  Conclusion

Because Michas failed to present evidence sufficient to create a question of fact as to whether HCC's reasons for discharging him were pretextual, we find that the district court did not err in granting defendant HCC's motion for summary judgment. Therefore, the decision of the district court is AFFIRMED.

/1 Although the named party to the suit is Health Cost Controls of Illinois, Inc., this corporation is a shell subsidiary of Health Cost Controls of America, Inc. Health Cost Controls of Illinois has no employees and could not have been responsible for the actions claimed by Michas. Because Michas was actually employed by Health Cost Controls of America, Inc., we will refer to Health Cost Controls of America, Inc. ("HCC") as the defendant to this action.

/2 Local Rule 12(N) requires the non-movant to submit a response to the movant's Local Rule 12(M) submission of uncontested facts "to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." United States District Court for the Northern District of Illinois Local General Rule 12(N)(3)(a). Local Rule 12(M) requires the movant to submit with its motion for summary judgment "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. Local Rule 12(M)(3). Local Rule 12(N)(3)(b) also allows the non-movant to supplement the record with a statement of additional facts that require a denial of summary judgment. Local Rule 12(N) states that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." N.D. Ill. Local Rule 12(N)(3)(B).