In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1989

JEANETTE PETTS,

*Plaintiff-Appellant*,

*v.*

ROCKLEDGE FURNITURE LLC, a Division of
Ashley Furniture Industries, Inc.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 C 553—**John C. Shabaz**, *Judge.*

———————

ARGUED FEBRUARY 14, 2008—DECIDED JULY 21, 2008

———————

Before RIPPLE, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Jeanette Petts sued her former
employer, Rockledge Furniture LLC, a Division of Ashley
Furniture Industries, Inc., alleging that it terminated her
employment as assistant store manager because of her
sex in violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq.* The district court granted
Rockledge's motion for summary judgment, con-
cluding that Ms. Petts produced insufficient evidence of
sex discrimination in the summary judgment process

under either the direct or indirect methods of proving discrimination to justify a trial. Ms. Petts appeals, asserting that a trial should have resulted under either method of analyzing her claim.

It is not uncommon in employment discrimination cases that most, if not all, of the facts are not in dispute. But rather, the contest revolves around whether the reasonable inferences that can be drawn from those facts are sufficient to support a claim of discrimination. This case fits that pattern. For the reasons which follow a description of the relevant facts regarding Ms. Petts's tenure at Rockledge, we conclude that she has insufficient evidence of sex discrimination under both the direct and indirect methods and therefore affirm the district court's judgment.

## I. Background

Rockledge, a high volume retailer, owned and operated three Ashley Furniture HomeStores in Franklin, Madison, and Pewaukee, Wisconsin. The Madison store was the smallest in size and sales volume; the Franklin store was the largest. In early 2003, Rockledge hired Brett Johnson, a male, to be store manager of the Madison store. That store was to have a store manager and two assistant managers, along with two other positions with managerial responsibilities, namely, a visual manager and an office manager. Rockledge hired Mary Tortorice, a female, and Terry Kean, a male, as assistant managers and two females for the other positions with managerial responsibilities at the Madison store. Ms. Petts attended an Ashley job fair in September 2003 and Mr. Johnson hired her on the spot for a sales position.

In July 2004, Mr. Johnson was promoted to general manager of Rockledge, with full responsibility for operations and hiring and firing authority over all Rockledge personnel. In late 2004, following Ms. Tortorice's transfer to the Pewaukee store as assistant manager, Mr. Johnson approved Ms. Petts's promotion to assistant manager of operations at the Madison store. At the time Scott Rorek, a male, was the assistant manager for sales at the store since Mr. Kean had been promoted to store manager.

In early 2005, Rockledge's upper management recognized the need to reduce operating costs and improve profitability. The Madison store was not profitable in 2004. By mid-March, Mr. Johnson had proposed a multi-faceted plan to reduce costs. The plan included reducing management staff at the Madison store by eliminating an assistant manager position and utilizing non-management sales leads or key carriers, that is, employees who could simply open and close a store without possessing true managerial responsibilities. Under the plan, Rockledge would test the new management model in Madison and, depending on the results, implement the model in other lower sales volume stores. As a result of this plan, either Ms. Petts or Mr. Rorek would lose her or his position.

Mr. Johnson testified that he decided to eliminate Ms. Petts's position because Mr. Rorek had marginally greater seniority in a management position at Rockledge and had over ten years of relative management experience with "big box" retailers such as American and Best Buy, while Ms. Petts's only prior retail management experience was in a sandwich shop franchise. Mr. Johnson stated that tenure was a factor in his decision, but relative experience was the principal factor. He sought

input from the Madison Store Manager Kean who sug-
gested that Ms. Petts be terminated because she was one
of the newest team members and perhaps the easiest to
replace by having a customer service lead or other em-
ployee assume some of her responsibilities. Mr. Johnson
also consulted with Rob VanCraenenbroeck, Rockledge's
Director of Human Resources, in making his decision to
terminate Ms. Petts's position.

On April 5, 2005, Mr. Johnson visited the Madison
store and along with Mr. Kean met with Ms. Petts. They
advised her that her assistant manager position was being
eliminated based on the business trend at the store. They
offered her three alternative positions at the Pewaukee
store, including a sales position, and indicated she
would be eligible to re-apply for a management position.
Ms. Petts was given time to consider the offer. On April 9,
she declined the offer, advising Mr. Johnson that the
positions were not financially suitable and would require
a longer commute. She asked Mr. Johnson to contact her
if any assistant manager positions became available. He
told her that he would consider her for such a position
and would notify her if any became available.

Mr. Johnson also terminated Ms. Tortorice from her
position as assistant manager at the Pewaukee store on
April 5, albeit for what he asserted were performance
reasons. He detailed the performance issues in a written
notice, which included Ms. Tortorice's admitted loss of
a $1,083.11 customer check, inconsistent and missing
funding reports, lack of staff development and training,
and other customer service complaints about her. Al-
though these occurrences were not contested by
Ms. Petts in the summary judgment process, she did point
out that Mr. Johnson erred in describing the reports.

Mr. Johnson explained in his deposition that he mistakenly referred to the funding reports for which Ms. Tortorice had no responsibility and that he meant to refer to the daily sales and cash reports, which had not been completed on several occasions in March 2005. Ms. Tortorice accepted responsibility for the deficiencies in these reports. Her assistant manager position was eliminated in connection with her termination. Mr. Johnson offered to provide Ms. Tortorice with a reference because he liked her and thought she would do well in a slower-paced, lower-volume retail environment. He claims that he consulted with Mr. VanCraenenbroeck the day he terminated Ms. Tortorice but was contradicted on that point. Mr. VanCraenenbroeck testified that he was not aware of Ms. Tortorice's termination until after she had been fired.

From the time of Ms. Petts's termination until Mr. Johnson's departure from Rockledge in October 2005, the Madison store operated with a two manager/one sales lead structure. Ms. Petts's position was not filled. Instead, Wendy Bohner, a customer service employee, and Cindy Gomez-Trujillo, a customer service lead, both females, took over Ms. Petts's former duties. Rockledge did not fill Ms. Tortorice's assistant manager position in the Pewaukee store either. No assistant manager position was eliminated in the Franklin store which Rockledge contends was justified by the store's higher volume.

Shortly after the terminations of Ms. Petts and Ms. Tortorice, the two remaining members of the management team in the Pewaukee store unexpectedly left Rockledge's employ. Mr. Johnson shuffled existing management staff, all male, to fill the gap. According to Mr. Johnson, time did not permit him to interview

external candidates for these positions and he did not think to offer them to Ms. Petts. A few months later, Mr. Johnson promoted Heidi Benites, a female, over male applicants to an assistant manager position in the Franklin store. Still later in 2005, Rockledge advertised externally for the assistant manager position in the Madison store, and Mr. Johnson hired Mark Mader, a male, for the position. Ms. Petts never contacted Mr. Johnson or Rockledge to inquire about any management openings, however.

Not surprisingly, Ms. Petts never heard anyone at Rockledge say that she was terminated because of her sex, and she is unaware of any document that says that she was terminated because of her sex. She alleges, however, that various sex-based comments were made by Mr. Johnson and Mr. Rorek, though none were directly related to her termination. Ms. Petts first claims that Mr. Johnson made negative comments about women in staff meetings, but when pressed about the frequency of such comments, she testified that she could only remember one meeting in particular. She was not certain if there were more. Ms. Petts believed that this single comment was made at a staff meeting that took place shortly after the Madison store opened in late 2003. When asked what was said, Ms. Petts answered that Mr. Johnson made a "comment about women this or women that. If a female salesperson would bring up a point or ask a question, he would say something to the effect of, jeez, women, you know, [and] kind of roll his eyes back." Ms. Petts also claims that in early 2004, Mr. Johnson made a remark to one of her coworkers, Jennifer Kane, who had been working on a particularly difficult problem. He said something like, "[a]s long as you keep acting like a

man, you will get places," which was a reflection of his satisfaction with Ms. Kane's work. (Mr. Johnson denies making this statement.) Third, at the Pewaukee store opening in January 2005, Mr. Johnson introduced the store management team, including Ms. Tortorice, to the new staff, referring to her as the "mother of the store."

Ms. Petts also claims that Mr. Rorek made discriminatory comments and that Mr. Johnson was aware of them but did nothing to stop him. Specifically, she testified that Mr. Rorek "made many comments about how men are better than women, just general loose comments on a regular basis in the workplace. He was very good at saying, oh, that's because she was a woman, or that's because he's a man, making the difference. He was also very chummy with the male salespeople and very cold to the women." Ms. Petts said that Mr. Johnson "was around a couple of times when [Rorek] made comments, and they were just laughed off [by Mr. Johnson]." When asked to identify specific occasions when this occurred, Ms. Petts could be specific about only one: Once when Mr. Johnson was in close proximity to Mr. Rorek, the latter commented to a female customer service person, "it sounds like, just like a woman or some side step comment like that." Ms. Petts could not specify when this comment was made or to whom.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 680 (7th Cir. 2007). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as

a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We construe all facts and draw all reasonable inferences in favor of the non-moving party. *Brown*, 499 F.3d at 680. But inferences supported only by speculation or conjecture do not suffice to create a triable issue. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

A plaintiff alleging sex discrimination in employment under Title VII can proceed under either the direct method or the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004). Ms. Petts proceeded under both.

## A.  Direct Method

Ms. Petts argues that under the direct method she has enough circumstantial evidence of discrimination to defeat summary judgment. A plaintiff can prevail under the direct method "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.' " *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). However, the circumstantial evidence " 'must point directly to a discriminatory reason for the employer's action.' " *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). We have recognized three different types of circumstantial evidence of intentional discrimination. *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007). The first and most common "consists of suspicious timing, ambiguous statements oral or written, behavior toward or com-

ments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn . . . ." *Id.* at 862 (quoting *Troupe*, 20 F.3d at 736). The second type is evidence that similarly situated employees outside the protected class received systematically better treatment. *Id.*; *Troupe*, 20 F.3d at 736. The third is evidence that the plaintiff was qualified for the job in question but passed over in favor of a person outside the protected class and that the employer's stated reason is a pretext for discrimination. *Hossack*, 492 F.3d at 862; *Troupe*, 20 F.3d at 736. Ms. Petts's circumstantial evidence consists of the following: (1) comments about women made by Mr. Johnson and Mr. Rorek that she contends were discriminatory; (2) the termination of all of the female assistant managers, and only the female assistant managers; (3) Mr. Johnson's decision to eliminate Ms. Petts's position rather than that of Mr. Rorek who was similarly situated but higher paid; (4) what she contends is a lie about the circumstances surrounding Ms. Tortorice's termination; and (5) that Mr. Johnson broke his promise to notify Ms. Petts when future management positions became available.

Ms. Petts first contends that the district court erred in concluding that Mr. Johnson's "acting like a man" comment to Ms. Kane did not raise an inference of discriminatory intent. While Ms. Petts is right that a plaintiff need not offer evidence of multiple discriminatory statements by a decisionmaker, "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006), *cert. denied*, 127 S. Ct.

2973 (2007). A remark can raise an inference of discrimination when it "was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007); *see also Steinhauer v. DeGolier*, 359 F.3d 481, 487-88 (7th Cir. 2004) (concluding that decisonmaker's comment not made to plaintiff, made in passing, and unrelated to any employment decision was not sufficient evidence of discriminatory intent). Mr. Johnson's "acting like a man" comment to Ms. Kane was made in 2004—more than one year before Ms. Petts's termination and unrelated to her termination. We previously have concluded that a decisionmaker's comment made more than a year before the adverse action fails to constitute evidence of discrimination under the direct method. *Hemsworth*, 476 F.3d at 491 (concluding that president's comment that the employee who had suffered a stroke looked tired and old was not sufficient evidence of discrimination because comment was made more than a year before employee's termination). The "acting like a man" comment is therefore insufficient to point directly to a discriminatory reason for Ms. Petts's termination.

According to Ms. Petts, the district court erred in not considering whether Mr. Johnson's reference to Ms. Tortorice as the "mother of the store" along with his "acting like a man" comment to Ms. Kane raised an inference of discriminatory intent. However, her contention about the "mother" comment starts with a procedural snag. Each of the district judges in the U.S. District Court, Western District of Wisconsin has adopted special procedures to be followed on motions for summary judgment. Judge Shabaz's summary judgment

procedures require that if the party opposing summary judgment believes that there are material facts not stated by the movant, then the opposing party is to present those factual propositions in a stipulation of facts or a statement of proposed findings. The procedures indicate that the court is not required to consider a piece of evidence unless it is set forth in the manner described and is under no obligation to search the record for factual matters that might support the denial of a summary judgment motion.[1] We have held that district courts may refuse to consider evidence that is noncompliant with their local procedural rules much like Judge Shabaz's special procedures for summary judgment at issue here. *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2001); *Tatalovich v. City of Superior*, 904 F.2d 1135, 1139-40 (7th Cir. 1990). Unfortunately, Ms. Petts did not identify the "mother" comment as a factual proposition in either her response to defendant's proposed findings of fact or in her own proposed findings of fact. And Judge Shabaz did not mention the "mother" comment in his memorandum and order. We therefore reasonably can infer that he chose to disregard this evidence. By failing to include the "mother" comment as a proposed finding of fact, Ms. Petts forfeited any right to rely on it as a factual proposition.

But even if the "mother" comment had been adequately identified for the district court, it does not sup-

---

[1] This procedure presumably is based on the oft quoted "Judges are not like pigs, hunting for truffles buried in" the record. *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008).

port Ms. Petts's direct theory of discrimination. Of course, the word "mother" can connote gender traits. But it also can mean a woman in a position of authority. http://www.merriam-webster.com/dictionary/mother (last visited June 19, 2008). There is nothing inherently discriminatory about referring to a woman as a "mother." At worst it is an ambiguous remark. Moreover, the "mother" comment was made in January 2005, approximately three months before Ms. Petts's termination. We have concluded that comments made three and even two months before the challenged employment action fail to create a reasonable inference of discrimination. *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910-11 (7th Cir. 2002) (finding supervisors' statements made "nearly two months" before employee's termination were not contemporaneous to the termination and thus were not evidence of discrimination); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 n.7 (7th Cir. 1997) (concluding vice president's comment made "as much as three months" before termination was not direct evidence of discrimination). Ms. Petts has not shown any other connection between the "mother" comment and her termination. Thus, the "mother" comment is insufficient to raise an inference of discrimination.

Ms. Petts contends that the district court also erred in considering only specific comments and ignoring ambiguous comments by Mr. Johnson and Mr. Rorek that she asserts raise an inference of discriminatory intent. But Ms. Petts seems to confuse ambiguity with nonspecificity. The district court correctly declined to consider her conclusory, nonspecific allegations about comments allegedly made by Mr. Johnson and Mr. Rorek. Where the nonmoving party bears the burden of proof

at trial, as Ms. Petts would, she must present *specific facts* showing a genuine issue to survive summary judgment. *Celotex*, 477 U.S. at 323-24; *see, e.g.*, *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) ("[I]t is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact. . . ."); *Lucas v. Chi. Trans. Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (refusing to consider plaintiff's conclusory assertions that African-Americans were treated "more harshly" in that they were given tougher assignments and written up for reasons non-African-Americans were not where plaintiff offered no specific instances of support for his assertions); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well-settled that conclusory allegations . . . do not create a triable issue of fact."). While ambiguous statements may provide circumstantial evidence of discriminatory intent, to defeat summary judgment, Ms. Petts must offer specific examples of ambiguous statements. Other than, perhaps, Mr. Johnson's "mother" comment, she has not. Moreover, without any evidence to show that the allegedly ambiguous comments were temporally or otherwise related to her termination, such comments do not raise a reasonable inference of discriminatory intent with respect to her termination.

Only three other comments are specifically identified by Ms. Petts. She testified that in late 2003 Mr. Johnson made a comment about "women this or women that," and if a female salesperson brought up a point or asked a question, he said "something to the effect of, jeez, women, you know, [and] kind of roll his eyes back." This comment, made approximately one and one-half years before Ms. Petts's termination, was distant in time from her termination and was not shown to have any

connection to the termination decision. Ms. Petts states that Mr. Rorek made many comments about how men are better than women and says that he was very chummy with the men and very cold to the women. But it is undisputed that Mr. Rorek had no supervisory authority over Ms. Petts and he provided Mr. Johnson with no input on the management restructuring. Nor was it shown that these comments were made around the time of the termination decision. Ms. Petts adds that Mr. Johnson was around a couple of times when Mr. Rorek made negative comments about women and Mr. Johnson just laughed them off, but she could specifically identify only one: Mr. Rorek made a remark to a female customer service person to the effect that "it sounds like, just like a woman or some side step comment like that." Ms. Petts could not offer any specifics as to when this comment was made, and thus, cannot show the necessary connection to the decision to terminate her employment.

The other bits and pieces of the circumstantial evidence together fall short of the mark of pointing directly to a discriminatory reason for Ms. Petts's termination. Ms. Petts asserts that Rockledge terminated all the female assistant managers and only female assistant managers as part of its downsizing. Although Ms. Petts was terminated as part of the management restructuring, the unrefuted evidence produced by Rockledge is that Ms. Tortorice was not discharged because of the restructuring but because of her performance. And even if both Ms. Petts and Ms. Tortorice were terminated as part of the restructuring, this by itself does not suffice as direct evidence that Ms. Petts was terminated because of her sex. *See Sartor*, 388 F.3d at 278 ("In the context of a business undergoing a substantial reorganization, the fact that the sole

black employee at a particular management level was not retained does not itself signal that the company was motivated to fire her because of her race."). Ms. Petts also relies on the fact that both she and Ms. Tortorice were terminated on the same day. But this coincidence in timing alone does not suffice. As stated, Ms. Petts ignores the undisputed fact that Ms. Tortorice lost her job not because of the downsizing, but because of her performance.[2]

Additionally, Ms. Petts questions whether the downsizing really was a cost-saving measure because she was let go and Mr. Rorek, who earned more than she, was retained. Yet it is undisputed that the elimination of one assistant manager position would and did, in fact, save costs. In deciding which employee to let go, Mr. Johnson could weigh the monetary savings of eliminating one salary with the considerations of whom the store needed more and who could be replaced more easily. *See Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("explaining that we do not sit as a super-personnel department with authority" to correct an employer's decision that is unwise or unfair); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) ("[W]e do not sit as a superpersonnel department that will second guess an employer's business decision."). It is undisputed that Mr. Johnson considered and weighed tenure at Rockledge and relative experience between

---

[2] Ms. Petts showed that Ms. Tortorice was not responsible for any problems with the funding reports, but Mr. Johnson's other performance-related reasons for terminating her have not been challenged. His misdescription of the daily sales and cash reports was innocuous.

Ms. Petts and Mr. Rorek. He also consulted the Madison Store Manager Kean, who suggested legitimate, nondiscriminatory reasons for terminating Ms. Petts rather than Mr. Rorek. Admittedly, Mr. Johnson and Mr. VanCraenenbroeck disagree about having any conversations immediately before Ms. Tortorice's termination. But there is no conflict in the evidence regarding the reasons for discharging Ms. Tortorice. Thus, their differing recollections do not raise a reasonable inference of discrimination, even if one disbelieves Mr. Johnson. Finally, Mr. Johnson did not contact Ms. Petts about immediate management openings, but he explained that he had to "scramble" to keep the Pewaukee store afloat and Ms. Petts had just turned down the offer of three other jobs in the Pewaukee store because of, among other things, the commute. We have considered all of the circumstantial evidence offered by Ms. Petts, but it fails to raise a reasonable inference of sex discrimination. Therefore, the district court correctly held that she could not prevail under the direct method of proof.

Here, it is appropriate to address Ms. Petts's argument that the district court improperly relied on the same-actor inference (also referred to as an "inference of nondiscrimination") to defeat an inference of discrimination created by her circumstantial evidence. First, we do not understand the district court actually to have found that Ms. Petts's evidence raised a reasonable inference of sex discrimination. Instead, it seems the court assumed that *if* her evidence created an inference of sex discrimination, then the inference was rebutted by the fact that Mr. Johnson both hired and promoted Ms. Petts despite her sex. Reliance on the same-actor inference to carry a moving party over the summary

judgment hurdle seems to go too far. We reiterate the
concerns about using the inference of nondiscrimination
in favor of a moving party that were recently expressed
in *Filar v. Board of Education of City of Chicago*, 526 F.3d
1054, 1065 n.4 (7th Cir. 2008) (" '[T]he drawing of legiti-
mate inferences from the facts are jury functions,' and
the court 'must disregard all evidence favorable to the
moving party that the jury is not required to believe.' ")
(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530
U.S. 133, 150-51 (2000)). Nonetheless, Ms. Petts's circum-
stantial evidence fails to point directly to a discrim-
inatory reason for the termination of her employment.
No reliance on the fact that the same person hired, pro-
moted, and fired Ms. Petts is necessary to reach this
conclusion.

## B. Indirect Method

Under the indirect method, Ms. Petts must first demon-
strate a prima facie case of discrimination. If she estab-
lishes a prima facie case, then the burden shifts to
Rockledge to articulate a legitimate, nondiscriminatory
reason for her termination "which if believed by the trier
of fact, would support a finding that unlawful discrim-
ination was not the cause of the employment action."
*Brown*, 499 F.3d at 681 (quotation omitted). If Rockledge
meets this burden, then the burden returns to Ms. Petts
to prove that the proffered reason is a pretext for
sex discrimination. *Id.* at 682.

But what is the appropriate prima facie case? The district
court applied the prima facie case for a mini-reduction-in-
force ("mini-RIF"); Ms. Petts argues that the traditional
prima facie case should be applied. But we should back

up one moment. Regardless of which variation is appropriate, Ms. Petts has sufficient evidence to establish the first three prongs of her prima facie case: she was a member of a protected class, she was meeting Rockledge's legitimate business expectations, and she suffered an adverse employment action. Thus, we concern ourselves with only the fourth prong.

In a mini-RIF case, where the dismissed employee's duties are absorbed by another employee or employees rather than eliminated, the court applies a modified version of the fourth prong of the prima facie case. *Filar*, 526 F.3d at 1060. This variation requires proof that the plaintiff's duties were absorbed by employees not in the protected class. *Id.*; *Merillat*, 470 F.3d at 690 n.1 (citing *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 n.5 (7th Cir. 2000)). Citing *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687 (7th Cir. 2000), Ms. Petts argues that the mini-RIF variation is appropriate only when one employee is discharged. *Michas* does contain a sentence that says: "In a mini-RIF, a single employee is discharged and his position is not filled." *Id.* at 693. But neither *Michas* nor any of the other cases cited by Ms. Petts says that the mini-RIF variation should never be applied if more than one employee is discharged. We have explained that the determinative factor in deciding whether the mini-RIF variation applies is whether the discharged employee's duties were absorbed by an existing employee or eliminated, not the number of employees let go. *See Merillat*, 470 F.3d at 690 n.1; *Paluck*, 221 F.3d at 1011 n.5. Ms. Petts next argues that a court need not apply the mini-RIF variation if doing so makes it more difficult for a plaintiff to prove her prima facie case. However, we have said that where the plaintiff's

duties "were reabsorbed by [another employee] after [the plaintiff's] termination . . . we *must* apply the indirect burden shifting method for a mini-reduction-in-force situation." *Hemsworth*, 476 F.3d at 492 (emphasis added). Ms. Petts's duties were absorbed by other employees after her position was eliminated; so the mini-RIF variation of the prima facie case was properly utilized.

And the district court correctly found that Ms. Petts cannot establish the fourth prong of the mini-RIF prima facie case. Even if some of her duties were absorbed by male employees, as she claims, some of them were absorbed by women. If we were to adopt Ms. Petts's view and apply the traditional prima facie test because it eases her burden, her claim does not get far. Under that fourth prong she would have to show that Rockledge treated similarly situated employees outside of the class more favorably. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). Arguably she can—the other assistant manager of the Madison store, Mr. Rorek, a male, kept his job. Thus, the ability to prove a traditional prima facie case advances Ms. Petts's claim, but not for long.

The reason: Rockledge has offered legitimate, nondiscriminatory reasons for Ms. Petts's discharge. An assistant manager position at the Madison store was to be eliminated as a cost-saving measure for the under-performing and relatively smaller Ashley Furniture Wisconsin store. Mr. Johnson chose to eliminate Ms. Petts's position over Mr. Rorek's because of Rorek's marginally greater seniority in a management position at Rockledge and his extensive management experience with "big box" retailers. So the ball returns to Ms. Petts's court to show pretext. "A pretext . . . is a deliberate false-hood." *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558,

562 (7th Cir. 2007) (internal quotation omitted). "[T]o show pretext, [plaintiff] must show more than [defendant's] decision was mistaken, ill considered or foolish, [and] as long as [the employer] honestly believes those reasons, pretext has not been shown." *Id.* (quoting *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (alterations in *Kodl*). Our only concern is with the honesty of the employer's beliefs. *Id.*

Ms. Petts contends that when all inferences are drawn in her favor, she has sufficient evidence of pretext. She attempts to refute the cost-saving explanation for eliminating an assistant manager position by challenging the decision to retain Mr. Rorek who earned more than she did. But Rockledge was entitled to consider more than just the dollars saved by eliminating one of the assistant manager's salaries. *See Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004) ("[W]e do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of that decision."). Ms. Petts also relies on her own assessment of Mr. Rorek's qualifications as against her own, but this is insufficient to show pretext. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 n.8 (7th Cir. 2006) (noting that plaintiff fails to raise a genuine issue of fact merely by challenging the judgment of supervisors); *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("[A] plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions."). Ms. Petts emphasizes the minimal difference in tenure between her and Mr. Rorek. Yet Mr. Johnson relied not only on tenure with Rockledge but also on relative experience, which

was the principal factor in his decision. Importantly, Mr. Rorek's relative experience far surpassed that of Ms. Petts.

Pretext is shown, Ms. Petts next argues, by the alleged shifting and inconsistent justifications Mr. Johnson gave for firing Ms. Tortorice. However, she has not offered any evidence of shifting or inconsistent justifications. She instead focuses on Mr. Johnson's claim that he consulted with Human Resources before firing Ms. Tortorice. The dispute between Mr. Johnson and Mr. VanCraenenbroeck over whether the former consulted the latter the day of Ms. Tortorice's termination simply has no bearing on any material fact. It is Ms. Petts's termination, not Ms. Tortorice's, that is at issue. Even assuming that Mr. Johnson lied about consulting Mr. VanCraenenbroeck, no reasonable trier of fact could infer that he also lied about his reasons for firing Ms. Tortorice. Therefore, this conflict in the testimony does not suffice to raise a triable issue. *See Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment."). Mr. Johnson had the authority to terminate Ms. Tortorice without consulting Mr. VanCraenenbroeck just before doing so, and Mr. Johnson's reasons for firing Ms. Tortorice have remained constant.

According to Ms. Petts, Mr. Johnson's offer to be a reference for Ms. Tortorice undercuts his explanation that he fired her for performance reasons. Not so. Mr. Johnson explained that he liked Ms. Tortorice and thought she would do well in a slower-paced, lower-volume retail environment—one unlike Rockledge's. And even if the circumstances of Ms. Tortorice's firing

were suspicious (and they are not), they do not directly refute the reasons given for eliminating Ms. Petts's position. *See, e.g.*, *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997) (explaining that to show pretext, the plaintiff must "squarely rebut" the specific reason articulated by the defendant). Thus, the circumstances of Ms. Tortorice's discharge do not support a finding of pretext.

Our review of the record leads us to conclude that Ms. Petts has insufficient evidence under either the direct or indirect method of proving intentional discrimination. Therefore, summary judgment was properly entered in favor of Rockledge.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.