NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 19, 2014[*]
Decided March 21, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 13-2327

| | |
|---|---|
| JEREMY B. DIXON, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Southern District of Indiana, |
| | New Albany Division. |
| *v.* | |
| | No. 4:10-cv-00072-SEB-WGH |
| PENNY PRITZKER, | |
| Secretary of Commerce, | Sarah Evans Barker, |
| *Defendant-Appellee.* | *Judge.* |

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Therefore the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

**O R D E R**

Jeremy Dixon appeals from an adverse decision at summary judgment in this action claiming that he was fired from his job at the United States Department of Commerce because of his sex and a congenital spinal disorder. The district court concluded that Dixon lacked evidence to establish a prima facie case of sex discrimination and had failed to exhaust his claim of disability discrimination. We affirm the judgment.

The following facts are recounted in the light most favorable to Dixon. *See Chaib v. Indiana*, No. 13-1680, 2014 WL 685274, at *4 (7th Cir. Feb. 24, 2014). In September 2005 the Department hired Dixon as a part-time statistical clerk for the Census Bureau's National Processing Center in Jeffersonville, Indiana. Dixon conducted phone interviews to collect statistical data for various surveys. His employment was subject to the satisfactory completion of a one-year probationary period, *see* 5 C.F.R. §§ 315.803, 315.804(b), during which the Department could fire him if it found him not fit or qualified for continued employment. 5 C.F.R. § 315.804(a). Counseling is not required.

During orientation Dixon received copies of the Processing Center's written attendance policy. His schedule was set biweekly based on survey needs and his availability. He could change his final schedule only in emergencies with supervisor approval. If Dixon could not work a scheduled shift, he was required to call within the first hour and obtain a supervisor's approval for the absence. Time and attendance records were maintained by a timekeeper, but it was Dixon's responsibility to ensure the accuracy of those records. He could be fired for being absent without calling in and for excessive unapproved absences and tardiness.

According to Dixon, he also learned during orientation that the Processing Center has several unwritten policies that supersede conflicting written policies. The Branch Chief, said Dixon, stressed that management did not "just fire people" for poor attendance and was willing to work with employees to rectify such issues. Dixon also was told that he could avoid being marked tardy by working additional hours.

From the beginning of Dixon's employment he was absent frequently. He missed five shifts during his first two months without documenting his explanation. Phyllis Smith, Dixon's supervisor for time and attendance purposes, counseled him in November 2005 about his excessive call-ins. Smith emphasized the importance of committed attendance and warned Dixon in writing that "excessive absences (call-ins) without acceptable documentation, may result in administrative action being taken."

    A month later Dixon was assigned temporarily to Smith's department to work on a survey. When he arrived a female coworker exclaimed, "Oh no! We have a man in our department!" in a contemptuous tone that made Dixon uncomfortable. During the next few weeks Dixon also overheard other female coworkers make what he interpreted to be disparaging comments about men, though at summary judgment he submitted no evidence about what the women said. There is no evidence that Dixon shared his concern with management, but on one occasion Smith herself told a female employee to disregard a question from a coworker because he was "just a man."

    Meanwhile, Dixon developed spinal pain that made sitting uncomfortable and caused him to miss work. Sometimes he provided management with a doctor's note; sometimes he did not. Dixon did give management a note from his doctor prescribing use of a chair with arm rests, and he received a new chair within an hour. In the weeks that followed, Dixon says, he also requested a footstool and permission to work from home, but both requests were denied. Dixon also says he was assured by a scheduler that his absences would not be problematic if he provided adequate documentation. The scheduler cannot recall making that statement and, at all events, did not have the authority to approve absences or decide whether disciplinary action was warranted.

    In May 2006, after Dixon had finished his assignment in Smith's department, she questioned him about three days for which a timekeeper had marked him absent without calling in. He pointed out, and Smith then confirmed, that on one of those dates he actually had been at work. Smith encouraged Dixon to review his time sheets and correct any other inaccuracies, but when he tried to do so, Smith was dismissive of his effort. When he last attempted to compare records with Smith, she laughed and told him, "Get out of here."

    On August 3, 2006, Dixon missed work after his abusive stepfather threatened to assault him. Dixon called in and explained to a supervisor that the situation might prevent him from working for several days. The next day Dixon did not report for work or call in.

    After learning about the August 4 absence, Smith reviewed Dixon's file and noted his numerous absences (Smith still supervised Dixon's time and attendance even though he no longer was assigned to her department). On August 21, 2006, she prepared a counseling form warning Dixon that he must improve his attendance record or risk serious administrative action, but she was unable to deliver the form or counsel

him in person because Dixon did not report to work again after Smith had prepared the form.

As Dixon's probationary period drew to a close, the Branch Chief reviewed his employment record in deciding whether he should be retained. In the ten months from October 26, 2005, through August 22, 2006, Dixon had missed work 63 times, including 17 times without management approval. He also had been tardy 27 times, requested schedule changes 26 times, and failed to call in on August 4. The Branch Chief noted that Dixon had been counseled in November 2005 and that Smith had prepared the undelivered counseling form in August 2006. The Branch Chief deemed Dixon's attendance record among the worst she had seen in 12 years managing the Processing Center. She recommended that he be fired. The Human Resources department approved that recommendation after reviewing Dixon's record with the Office of the General Counsel. Dixon received his letter of termination on September 6, 2006, detailing his "unacceptable attendance, unauthorized absence, tardiness, and failure to follow . . . scheduling procedures."

On September 13, 2006, Dixon sought precomplaint counseling for sex discrimination. *See* 29 C.F.R. § 1614.105(a). After the counselor issued her report, Dixon submitted a formal complaint with help from his union representative alleging sex discrimination only. When that allegation was being investigated, Dixon clarified his administrative complaint but did not assert disability discrimination. At no point did Dixon amend his administrative complaint to include an allegation of disability discrimination. *See* 29 C.F.R. § 1614.106(d).

The Department of Commerce issued its final decision in October 2007, concluding that Dixon had "not provided any evidence from which an inference of sex discrimination can be drawn" or shown that management's explanation for firing him was a pretext for discrimination. The Department also noted that Dixon, despite speculating during the investigation that his request for a new chair might have influenced the decision to fire him, had not alleged a disability within the meaning of the Rehabilitation Act, *see* 29 U.S.C. §§ 701 to 797. After the Equal Employment Opportunity Commission upheld that decision, EEOC Decision No. 0120080656 (Oct. 8, 2009), Dixon sought reconsideration. He explained that he now believed he had been discriminated against on the basis of a disability because the Department had relied on his absences—caused by his recently diagnosed congenital spinal disorder—to fire him. The EEOC denied reconsideration explaining that Dixon's request did not meet the criteria of 29 C.F.R. § 1614.405(b), which limits the arguments that can be raised in such a motion. EEOC Decision No. 0520100110 (Apr. 22, 2010).

Dixon then sued the Department of Commerce under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 to 2000e-17, and the Rehabilitation Act. His amended complaint alleges that the Department fired him because of his sex and also failed to accommodate his congenital spinal disorder. (Dixon's complaint includes additional references to "disparate impact," but that theory has since been abandoned.) In responding to the Department's motion for summary judgment, Dixon asserted that Smith is prejudiced against men and thus caused the Branch Chief to fire him by highlighting his attendance problems immediately before his probationary period ended. Dixon also insisted that his Rehabilitation Act claim should have been "equitably tolled" because he lacked the information necessary to proceed earlier with a charge of disability discrimination and because the persons involved and his evidence overlapped with his claim of sex discrimination.

In granting summary judgment for the Department of Commerce, the district court concluded that Dixon was proceeding on his claim of sex discrimination under the indirect method, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), but had not identified a similarly situated female coworker who was treated more favorably than him. The court also noted that Dixon had not shown that the Department's proffered reason for firing him—his excessive absences and tardiness—was a pretext for sex discrimination. Moreover, the court added, Dixon had not administratively exhausted his claim of disability discrimination. The Rehabilitation Act claim would fail regardless, the court reasoned, because Dixon lacks evidence that he was disabled or that the Department had failed to accommodate his condition.

On appeal Dixon first challenges the adverse decision on his Rehabilitation Act claim. As the district court recognized, however, Dixon did not administratively exhaust a claim under that statute, and that omission is fatal to his claim brought in district court. *See Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009); *McGuinness v. United States Postal Serv.*, 744 F.2d 1318, 1319-20 (7th Cir. 1984). He never filed an administrative complaint alleging disability discrimination, and mentioning his spinal disorder in his motion to reconsider the EEOC's decision on appeal could not cure that omission. *See* 29 C.F.R. §§ 1614.106(d), 1614.405(c). Dixon argues only that his Rehabilitation Act claim was "equitably tolled" because he did not know about the statute or that he was disabled when he filed his administrative complaint. Tolling can allow an otherwise late EEOC charge to be considered timely. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). But Dixon never *submitted* a disability charge, so tolling is irrelevant. *See Lewis v. City of Chicago*, 702 F.3d 958, 961 (7th Cir. 2012). We need not say more about the Rehabilitation Act.

Dixon also challenges the grant of summary judgment on his Title VII claim. He does not contest the district court's conclusion that his claim fails under the indirect method of proof. Instead, he insists that under the direct method he presented sufficient circumstantial evidence from which a jury could infer that the Department of Commerce fired him, not because of his excessive absences, but because of his sex. *See Collins v. Am. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012).

This argument goes nowhere. As evidence of sex discrimination, Dixon points to what he views as Smith's tolerance in her department of a "culture of sexist animus toward men," notes from his doctors explaining some of his absences, and—in his view—the Department's failure to warn him that his attendance was a problem despite the scheduler's reassurances and the Branch Chief's promise to work with those with attendance issues. But none of this is direct evidence of sex discrimination, with the possible exception of Smith's one remark that an employee's question could be ignored because he was "just a man." Dixon was assigned to Smith's department for only part of his year-long employment at the Processing Center, and he offered nothing contradicting the Department's evidence that he had 17 unapproved absences, was tardy for work on 27 days, and did not call in at all on August 4, 2006. Moreover, the Department *did* warn Dixon, both in its orientation materials and again when he was counseled in November 2005, that his absences were a problem that could lead to termination of his employment. Further, Dixon did not inform management that some of his female coworkers were making comments disparaging men, and the one comment he attributes to Smith is not evidence that the Branch Chief's decision to fire him was discriminatory. *See Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011); *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722–23 (7th Cir. 2008); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007).

We have considered Dixon's other arguments, and none merits discussion. Accordingly, the judgment is AFFIRMED.